# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

KASANDRA CARTER-BAUMGARTNER,

                      Plaintiff,

v.                                                         No. CIV 03-1032 LFG/WDS

TAXATION & REVENUE DEPARTMENT
of the State of New Mexico,

                      Defendant.

## MEMORANDUM OPINION AND ORDER
## DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### Introduction

THIS MATTER is before the Court on Defendant Taxation & Revenue Department's ("Defendant" or "Tax & Revenue") Motion for Summary Judgment, filed December 17, 2004 [Doc. No. 31]. The Motion is fully briefed and ready for resolution. [Doc. Nos. 34, 37, 38, 36.] After careful consideration of the pertinent law, pleadings and exhibits, the Court concludes that Defendant's Motion for Summary Judgment should be denied. The Court's reasoning follows.

### Background

On September 5, 2003, Plaintiff Kasandra Carter-Baumgartner ("Plaintiff" or "Carter-Baumgartner") filed her original Complaint for Damages for Discrimination on the Basis of Sex and Unlawful Retaliation. [Doc. No. 1.] On November 20, 2003, Plaintiff filed an Amended Complaint as to the caption only. [Doc. No. 13.] In the Amended Complaint, Carter-Baumgartner set forth two claims: sex discrimination and unlawful retaliation. She subsequently dismissed the claim of unlawful retaliation. Thus, the only remaining claim is sex discrimination.

Carter-Baumgartner alleges generally that she was subjected to a "continual barrage of unwelcome sexual harassment by her co-worker/occasional acting supervisor, Paul Lujan ("Lujan") from March 2002 until early August 2002, while working at Tax & Revenue. [Doc. No. 13, ¶ 11.] She seeks "special and compensatory damages" for the alleged sexual harassment/hostile work environment at Tax & Revenue.

**Summary Judgment Standard**

Summary judgment is not a "disfavored procedural shortcut." Rather, it is an important procedure designed to "secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). Summary judgment is appropriate when the moving party can demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S. Ct. 1598 (1970); Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co., 52 F.3d 1522, 1527 (10th Cir. 1995). The party moving for summary judgment has the initial burden of establishing, through admissible evidence in the form of depositions, answers to interrogatories, admissions, affidavits or documentary evidence, that there is an absence of evidence to support the opposing party's case and the moving party is entitled to judgment as a matter of law. Celotex, 477 U.S. at 325.

The factual record along with any reasonable inferences that may be drawn therefrom must be examined in the light most favorable to the party opposing summary judgment. Spaulding v. United Transp. Union, 279 F.3d 901, 904 (10th Cir.), *cert. denied,* 537 U.S. 816 (2002). Once the moving party meets its burden, the party opposing the motion must come forward with specific facts, supported by admissible evidence, which demonstrate the presence of a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49, 106 S. Ct. 2505, 2510 (1986); Biester v.

2

Midwest Health Servs, Inc., 77 F.3d 1264, 1266 (10th Cir. 1996). The party opposing the motion may not rest upon the mere denials of his pleadings to avoid summary judgment. Fed. R. Civ. P. 56(e); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991). Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." Mitchell v. City of Moore, 218 F.3d 1190, 1197-98 (10th Cir. 2000) (internal citation omitted). The Court is precluded, at this stage, from "weighing the evidence." Rather, the Court's function is limited to the determination of whether there is a factual dispute on a material issue.

### Material Facts

The Court summarizes the following material facts based on the pleadings, the parties' briefing and attached exhibits. The Court views all reasonable inferences drawn from the record evidence in the light most favorable to Plaintiff. The following recitation is not intended as the Court's adoption of these matters as fact, but, rather, as the facts viewed in favor of the Plaintiff.

In October 1998, Tax & Revenue hired Carter-Baumgartner. Lujan and Carter-Baumgartner were both tax examiners for Tax & Revenue and were co-workers.[1] Carter-Baumgartner and Lujan began working together at Tax & Revenue in about 1998, but Carter-Baumgartner alleges that from late March 2002 until early August 2002, Lujan subjected her to a "continual barrage of unwelcome sexual harassment," consisting of offensive touching and rubbing against Carter-Baumgartner's person. It is uncontested that Lujan rubbed Plaintiff's back, neck and shoulders at work on a number of occasions.

---

[1] Based on the pleadings, it appears that Lujan still works at Tax & Revenue. Carter-Baumgartner, however, continued to work for Tax & Revenue for about six months after the investigation and then resigned in order to take another position at a different state agency.

3

In 2002, Ms. Lee Annette Ortiz was the direct supervisor of Plaintiff and Lujan. Lujan was not a supervisor, but Ms. Ortiz sometimes left Lujan in the position of acting supervisor when she was out of the office.[2] Carter-Baumgartner perceived Lujan to have supervisory authority over her on those occasions. Ms. Ortiz testified that when she left an acting supervisor in charge, his or her duties were to handle immediate problems with taxpayers, specifically with angry taxpayers on the telephone who wanted to speak to a supervisor. In this connection, Lujan served as acting supervisor over Plaintiff and others at least two times a month. However, it is unclear whether Lujan allegedly harassed Carter-Baumgartner during any of the times he was left in the role of acting supervisor.

Ms. Ortiz observed that Lujan and Carter-Baumgartner were very close in the work place and described them as working partners who asked each other for work assistance. According to Ms. Ortiz, sometimes the two appeared happy and working well together, and at other times they avoided each other. Ms. Ortiz testified that Lujan and Carter-Baumgartner sometimes behaved like husband and wife who have a "tiff," and then shortly thereafter are fine again with each other. Ms. Ortiz believed there was mutual, playful or non-sexual touching between Lujan and Carter-Baumgartner. Ms. Ortiz saw Lujan rub Carter-Baumgartner's neck and also noted Carter-Baumgartner pushing Lujan away and placing Carter-Baumgartner's hand on Lujan's shoulder. Ms. Ortiz estimated that between March and August 2002, she saw Carter-Baumgartner touch Lujan in a non-threatening way three to five times a week, and/or that the two of them would interact with each other that often.

Carter-Baumgartner denies that she was friends with Lujan, denies interacting with him socially and denies touching him. Carter-Baumgartner states that she was "no more friendly with Lujan than with her other co-workers." Lujan states that he and Carter-Baumgartner had lunch

---

[2]The parties dispute whether Lujan qualifies as a supervisor under Faragher v. City of Boca Raton, 524 U.S. 775 (1998).

4

together on one occasion. Carter-Baumgartner, on the other hand, states that they discussed lunch, but only in the sense of "waving off" Lujan's advances. Lujan also asked her to have lunch or dinner with him on a number of other occasions, but she never committed to do it.

Carter-Baumgartner admits that Lujan was invited to her home (and that she gave him her address) on one occasion for purposes of having him buy a vehicle she was trying to sell. During that visit, Lujan gave, and Carter-Baumgartner accepted, several gifts for Carter-Baumgartner's children and also drove with Plaintiff and her two children to an auto parts store to get a battery for the vehicle she was selling.

Carter-Baumgartner's specific allegations of sexual harassment are that Lujan touched her in an unwelcome way by rubbing her shoulders and back at work. The touching was uninvited and unwelcome. This touching commenced sometime near the end of March 2002.[3] Although Plaintiff told her work friends and her mother about it, she initially felt she could resolve it on her own. None of Carter-Baumgartner's work friends observed Lujan touching or rubbing Plaintiff's shoulders. However, Lujan admitted that he rubbed Carter-Baumgartner's back, neck and shoulders perhaps every other day for awhile.

Carter-Baumgartner began closing the door to her office to avoid Lujan. On one occasion in March 2002, Ms. Ortiz came into Plaintiff's office and asked why her door was closed. Carter-Baumgartner told Ms. Ortiz that she kept it closed to keep Lujan out of her office because he was

---

[3] Plaintiff was somewhat inconsistent with her dates. She testified that Lujan began touching her either in March or in the beginning of June 2002. [Plaintiff's Dep. at 123-24.] It is also difficult to determine when she first and last told Lujan to stop touching her. She appears to have told him to stop touching her for the last time on July 6, 2002, at which point he did not touch her again. Carter-Baumgartner also stated in an affidavit attached to her response brief to the motion for summary judgment that she complained to Ms. Ortiz on May 18, 2002, but May 18, 2002 was a Saturday. Ms. Ortiz's day-timer calendar indicates that Plaintiff complained to her on March 5, 2002. During the investigation into her allegations, Plaintiff claims to have told the investigator that she was not clear about the dates when the various incidents occurred. Other witnesses who were interviewed about the allegations also were unclear about certain dates.

"rubbing up and down my hair and down the back of my shirt. . . . He's rubbing and feeling on me." According to Carter-Baumgartner, Ms. Ortiz responded that those actions constituted "sexual harassment" and stated she would speak to Lujan and get back to Carter-Baumgartner. Plaintiff did not file any formal or written complaint. Plaintiff claims Ms. Ortiz never did get back to her. It is undisputed, however, that Ms. Ortiz advised her supervisor, Ms. Harriette Mitchell within two weeks after June 24, 2002 (after Ms. Mitchell had been on vacation) of the comments Plaintiff made to Ms. Ortiz about Lujan, and further advised Ms. Mitchell that Ms. Ortiz believed the matter was resolved. Defendant did not initiate any investigation of the complaint.

After Plaintiff's conversation with Ms. Ortiz, Carter-Baumgartner contends that the rubbing and touching continued and that she kept telling Lujan to stop. Carter-Baumgartner described the touching as continuous. Sometimes Lujan would not touch her for the whole day, but later he would start again. On one occasion (in April 2002), Plaintiff had a conversation with a co-worker within Lujan's earshot in the attempt to give Lujan the message that she was seeing or dating someone. However, Carter-Baumgartner asserts that the inappropriate touching continued.

Carter-Baumgartner testified that on July 6, 2002, Lujan came into Plaintiff's office when she was on the phone and started rubbing her. Carter-Baumgartner yelled at him, saying: "Will you quit touching me. Quit rubbing on my back." Lujan jumped back and then told Carter-Baumgartner he was going downstairs to get something to eat and inquired if she wanted a burrito or something. When he returned, Lujan went into Plaintiff's office and placed a candy bar on her desk.

Carter-Baumgartner testified that Lujan stopped rubbing her shoulders and touching her "probably" on July 6, 2002, after she forcibly told him to stop. She did not have to tell him to stop after that date, although she claimed that the harassment continued in different ways, i.e, that Lujan

6

followed her around wanting to know what she was doing or where she had been and/or made excuses to talk to her.

On August 8, 2002, Carter-Baumgartner went to Ortiz's supervisor, Harriette Mitchell, who was the Bureau Chief. This time a formal investigation ensued on August 9, 2002. Richard Maag, Inspector General, conducted the investigation, which included taped and transcribed interviews with Carter-Baumgartner, co-workers Don Garcia, Valerie Salazar, Wendy Lunsford, Harriette Mitchell, Lee Annette Ortiz, and Paul Lujan.

Lujan was not disciplined nor was he removed as Carter-Baumgartner's acting supervisor. However, after the investigation, the offensive conduct ceased. Carter-Baumgartner has no complaints about the actions taken by Defendant in response to her August 8, 2002 complaint. There was no evidence presented that Lujan was disciplined after the investigation into Carter-Baumgartner's complaints. Based on the pleadings, it appears that from this date forward, Carter-Baumgartner had no problems with Lujan or the manner in which Tax & Revenue handled the matter.

### Tax & Revenue's Sexual Harassment Policy

It is undisputed that Tax & Revenue had a sexual harassment policy in effect during the pertinent time period. The policy states in part that it:

> prohibits sexual harassment by a supervisor, coworker or client and "has '**ZERO TOLERANCE**' for any behavior constituting sexual harassment in employment. Sexual harassing behavior may include, ***but is not limited to***:
>
> 1. unwelcome sexual teasing;
> 2. unwelcome "dirty" jokes;
> 3. intrusive sexually-explicit questions;
> 4. unwelcome touching of a person's clothing or body;
> 5. unwelcome hugging, kissing, patting or pinching;
> 6. staring or leering at an individual;
> 7. cornering someone;
> 8. spreading rumors about a person's sexuality;

      9.     obscene and sexually-explicit language or name-calling;
     10.    unwelcome pressure for dates;
     11.    unwelcome pressure for sexual favors; and
     12.    making employment decisions based on the granting or withholding of sexual favors.

[Doc. No. 34, Ex. A to Ferguson Dep.] (emphasis in original).

The policy states that all complaints of sexual harassment will be investigated promptly. The employee's responsibility, where possible, is to "initially tell the harasser that his or her behavior is unwelcome." However, if the employee is uncomfortable in taking this step, she or he is to seek assistance from the most immediate supervisor not involved in the incident within the chain of command, the Office of Inspector General or the Human Resources Manager. [Id.]

Under the policy, the supervisor is responsible for remaining alert to potential instances of sexual harassment and promptly taking action to stop such harassment. The policy requires supervisors to take prompt, appropriate action in response to allegations of sexual harassment and also requires the complaining employee to notify their most immediate supervisor or other appropriate manager as identified in the policy. Once an employee notifies a supervisor of alleged sexual harassment, the "supervisor must immediately ask the employee" a list of questions set out in the policy and document all responses given. Once completed, the supervisor then must forward the documented responses to the Division Director within 2 days from the date the employee first reported the incident.

## **Defendant's Motion for Summary Judgment**

Tax & Revenue seeks summary judgment on three grounds: (1) Carter-Baumgartner's allegations of sexual harassment are not sufficiently severe or pervasive to be actionable; (2) even if sexual harassment did occur, Lujan was not a supervisor; and (3) Tax & Revenue reasonably,

adequately and properly implemented and followed its sexual harassment policy once Carter-Baumgartner submitted her complaint in accordance with its sexual harassment policy.

Although not clearly articulated, Tax & Revenue's argument as to points 2 and 3 is more properly stated that it should not be held to a standard of vicarious or direct liability for Lujan's actions because Lujan was not a supervisory employee. Moreover, even if he was, Tax & Revenue can escape liability through raising and proving the affirmative defense set forth in Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998). Further, to the extent that Lujan was a non-supervisory employee, Tax & Revenue should not be held directly liable because it did not fail to remedy or prevent a hostile work environment of which management-level employees knew or should have known.

## Analysis

### I. HOSTILE WORK ENVIRONMENT

Title VII prohibits "discriminat[ion] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). In Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986), the United States Supreme Court held that a plaintiff could establish a violation of Title VII by proving that discrimination based on sex created a hostile or abusive work environment. "[C]ourts have consistently recognized two distinct categories of sexual harassment claims: *quid pro quo* sexual harassment,[4] and hostile work environment sexual harassment." Hicks v. Gates Rubber Co., 833 F.2d 1406, 1413 (10th Cir. 1987).

---

[4]*Quid pro quo* sexual harassment involves a showing that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands. Such is not the case here.

In this case, Carter-Baumgartner brings allegations that she was subjected to sex discrimination in the form of a hostile work environment. To establish the existence of a sexually hostile work environment, she must prove the following elements: (1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; and (4) [due to the harassment's severity or pervasiveness], the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment." Seymore v. Shawver & Sons, Inc., 111 F.3d 794, 797 (10th Cir.), *cert. denied*, 522 U.S. 935 (1997).

The first two prongs of the test do not appear to be in dispute, nor does Tax & Revenue argue that Plaintiff failed to present evidence that the alleged harassment was "based on her sex."[5] Thus, the Court decides only whether there is a genuine issue of material fact for a jury to decide as to the fourth prong, i.e., whether the complained of conduct was sufficiently severe or pervasive so as to alter a term, condition or privilege of Plaintiff's work.

Recently, the Tenth Circuit has explained that:

> not all harassment creates a hostile work environment; the harassment must be "sufficiently severe or pervasive to alter the conditions of [the victim's] employment." Severity and pervasiveness are evaluated according to the totality of the circumstances, . . . considering such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." . . . But severity and pervasiveness are not

---

[5]To satisfy the third prong, the plaintiff must produce evidence from which a fact finder could infer that the plaintiff was harassed because she is a woman. Penry v. Federal Home Loan Bank of Topeka, 155 F.3d 1257, 1261 (10th Cir. 1998), *cert. denied*, 526 U.S. 1039 (1999). Indeed, it is a critical issue for purposes of a Title VII claim to show that members of one sex were exposed to disadvantageous terms or conditions of employment to which members of the other sex were not exposed. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998) (internal citation omitted). However, because Tax & Revenue made no argument as to whether Carter-Baumgartner brought forward evidence that the alleged rubbing and touching was because of her gender, the Court does not address this inquiry, other than to note that the Tenth Circuit recognized that the inference is easy to draw if the harasser and the harassed are of opposite sexes, "at least when the conduct . . . involves 'explicit or implicit proposals of sexual activity. . . .'" Dick v. Phone Directories Co. Inc., 397 F.3d 1256, 1263 (10th Cir. 2005) (*citing* Oncale, 523 U.S. at 80).

10

>enough.  The "plaintiff must produce evidence that she was the object
>of harassment *because of her gender*."  Title VII is not a code of
>workplace conduct, nor was it "designed to bring about a magical
>transformation in the social mores of American workers.  Title VII
>targets discrimination.

Chavez v. New Mexico, 397 F.3d 826, 832-33 (10th Cir. 2005) (internal citations omitted) (emphasis in original).  Courts have described hostile work environments as such where the workplace is "permeated with discriminatory intimidation, ridicule and insult . . ." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).  The conduct in question is judged by both a subjective and an objective standard. *See id.  See e.g.,* Chavez v. Thomas & Betts Corp., 396 F.3d 1088, 1097 (10th Cir. 2005) (finding that from an objective standpoint, a reasonable jury could conclude that some of the assaults by a supervisor occurring over a four month period were "extreme in nature, physically threatening, and humiliating").  While the plaintiff must show that the environment was both objectively and subjectively hostile, she need not demonstrate that she suffered psychological harm or that her work suffered as a result of the harassment.  Penry, 155 F.3d at 1261.

The requirement that actionable conduct be severe or pervasive is crucial in that it prevents ordinary socializing in the workplace, horseplay, simple teasing or flirtation from becoming prohibited sexual discrimination.  *See* Oncale, 523 U.S. at 81 (internal citation omitted) (discussing same sex sexual harassment).  Title VII does not provide a remedy for boorish behavior or bad taste.  *See, e.g.,* Sprague v. Thorn Americas, Inc., 129 F.3d 1355, 1366 (10th Cir. 1997) (holding that unpleasant and offensive conduct does not necessarily create a hostile work environment).  Nor does conduct that merely engenders offensive feelings or that amounts to normal job stress violate Title VII.  *See* Smith v. Northwest Fin. Acceptance, Inc., 129 F.3d 1408, 1412 (10th Cir. 1997).

However, even a single incident of harassment, standing alone, can suffice if it is so severe as to alter the conditions of employment and create an abusive working environment.  Creamer v.

Laidlaw Transit, Inc., 86 F.3d 167, 170 (10th Cir.), *cert. denied*, 519 U.S. 983 (1996). Whether a work environment is hostile or abusive is a case-by-case determination guided by no sharply defined rules. Harris, 510 U.S. at 21, although isolated, accidental or sporadic incidents do not generally suffice. *See, e.g.*, Snell v. Suffolk County, 782 F.2d 1094, 1103 (2d Cir. 1986) (discussing hostile work environment claim based on race).

Here, in viewing the inference in a light most favorable to Carter-Baumgartner, Lujan clearly did touch her at work on many occasions. The touching was unwelcome and uninvited, and Plaintiff presented evidence that she subjectively found the alleged touching and contact to be offensive and unwelcome. The conduct occurred frequently over at least a several month time frame. Even Lujan admitted that he rubbed Plaintiff's shoulders every other day. Carter-Baumgartner contends that he also touched her back and neck on a regular basis, and that she told him to stop but that he did not stop touching her until she yelled at him on July 6, 2002.

With respect to the question of whether the alleged conduct was objectively hostile, the Court determines there are genuine issues of material fact for a jury to decide. The Court is unable to state, as a matter of law, whether the conduct of which Carter-Baumgartner complains was merely offensive, and therefore not actionable, or whether it was physically threatening, humiliating and interfered with Plaintiff's performance. The Tenth Circuit recognizes that the severity or pervasiveness evaluation is "particularly unsuited for summary judgment because it is quintessentially a question of fact." McCowan v. All Star Maint., Inc., 273 F.3d 917, 923 (10th Cir. 2001). Thus, this issue is best resolved by the fact finder and summary judgment is inappropriate on the hostile work environment claim.

## II.    EMPLOYER LIABILITY

The Court also finds disputed issues of material fact exist as to the question of possible employer liability. It is clear that this is a not a case where the employer would be subject to strict liability in the event a hostile work environment is proven. This is true because even if Lujan is found to have acted in a supervisory role, there is no contention that the alleged harassment culminated in a tangible employment action, nor is there any allegation that Lujan harassed Carter-Baumgartner at the behest of Tax & Revenue, with actual authority. *See* Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 765 (1998).

Tax & Revenue admits that Lujan was left as acting supervisor on a number of occasions, but there is a dispute as to what kind of authority he held in relation to Carter-Baumgartner. It appears that Lujan did not have the authority to hire or fire employees, and yet it is unclear whether he had the authority, as acting supervisor, to direct employees' work and daily activities, to recommend disciplinary action and/or to give feedback regarding an employee's performance.

If it is determined that Lujan had supervisory authority over Carter-Baumgartner and created a hostile work environment when he acted as a supervisor, Tax & Revenue still will be permitted to raise an affirmative defense to vicarious liability by establishing that it exercised reasonable care to prevent and to promptly correct any sexually harassing behavior and that Carter-Baumgartner unreasonably failed to avail herself of preventative or corrective opportunities provided by Tax & Revenue or to otherwise avoid harm. Faragher, 524 U.S. at 807.

Moreover, if it is determined that Lujan did not act with supervisory authority over Carter-Baumgartner, the employer may also be held liable under a negligence standard for co-worker harassment. If it is decided that Lujan was a co-worker when he allegedly created a hostile work environment, Carter-Baumgartner bears the burden of establishing that Tax & Revenue's conduct was

13

unreasonable.  <u>Wilson v. Tulsa Junior College</u>, 164 F.3d 534, 541 n. 4. (10th Cir. 1998).  Plaintiff must prove that Tax & Revenue was itself negligent because it knew or should have known about the alleged conduct and failed to stop it.  <u>Burlington Indust., Inc.</u>, 524 U.S. at 759.

Here, Carter-Baumgartner provided evidence that she perceived Lujan to have acted in a supervisory capacity over her.  Further, it is admitted that Lujan was an acting supervisor on a number of occasions.  It is contested whether Plaintiff's supervisor acted promptly and adequately in addressing Carter-Baumgartner's initial complaints of alleged sexual harassment.  Thus, in drawing all inferences in favor of Carter-Baumgartner, the Court determines that summary judgment on the basis of employer liability issues is inappropriate.  Should the fact finder determine that a hostile work environment existed, there are genuine issues of material fact to decide regarding employer liability, and that question also is reserved for the jury.

## Conclusion

Because the Court concludes that material facts are in dispute as to whether the complained of conduct was pervasive or severe and whether Tax & Revenue might be held liable for the alleged conduct, the Court denies summary judgment in favor of the employer.

IT IS THEREFORE ORDERED that Defendant Taxation & Revenue Department's Motion for Summary Judgment [Doc. No. 31] is DENIED.

                                                             Lorenzo F. Garcia
                                                             Chief United States Magistrate Judge
                                                             (sitting by designation)

ATTORNEY FOR PLAINTIFF:
Richard W. Sutten, Esq.

ATTORNEY FOR DEFENDANT:
Patricia J. Turner, Esq.